UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

DANIEL L. WILSON,                      )
                                       )
              Plaintiff,               )
                                       )
         v.                            )        No. 1:08 CV 57 SNLJ
                                       )                      DDN
                                       )
MICHAEL J. ASTRUE,                     )
Commissioner of Social Security,       )
                                       )
              Defendant.               )


**REPORT AND RECOMMENDATION OF**
**UNITED STATES MAGISTRATE JUDGE**

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Daniel L. Wilson for disability insurance benefits and supplemental security income under Title II and Title XVI of the Social Security Act (the Act), 42 U.S.C. §§ 401, et seq., and 1381, et seq. The action was assigned to the undersigned United States Magistrate Judge for review and a recommended disposition under 28 U.S.C. § 636(b). For the reasons set forth below, the undersigned recommends that the ALJ's decision be affirmed.


**I.  BACKGROUND**

Plaintiff Daniel Wilson was born on September 9, 1969. (Tr. 35.) He is 6'1" tall with a weight that has ranged from 345 pounds to 398 pounds. (Tr. 125, 173.) He is married and has two children. (Tr. 76-77.) He completed high school and one year of college. (Tr. 134.) He last worked in home construction. (Tr. 127.)

On March 8, 2006, Wilson applied for disability insurance benefits and supplemental security income, alleging he became disabled on February 15, 2004, on account of high blood pressure, diabetes, excessive obesity, arthritis, joint and muscle fatigue, severe back problems, right ankle

swelling, blindness in his left eye, and gout.[1]  (Tr. 76-78, 135.)  On July 27, 2006, Wilson wrote to the Social Security Administration, requesting that his alleged onset date be changed to February 13, 2006. (Tr. 51.)  He received a notice of disapproved claims on June 2, 2006. (Tr. 60.)  After a hearing on April 9, 2007, the ALJ denied benefits on May 5, 2007.  (Tr. 8-18, 287-322.)  On February 19, 2008, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 2-4.)

## II.  MEDICAL HISTORY

On an unknown date, Wilson completed a disability report.  He noted being unable to work because of muscle disease, severe arthritis, depression, diabetes, hypertension, excessive obesity, blindness in his left eye, gout, high cholesterol, severe back problems, and swelling in his right ankle.  These conditions gave him problems lifting, carrying, and concentrating.  His hands hurt.  The constant pain, fatigue, and depression made working almost impossible.  He had no energy.  His diabetes caused vision and balance problems.  Wilson believed he became unable to work on February 15, 2004, due to these impairments.  Wilson continued to work, though, with fewer hours and different job duties. He stopped working on February 12, 2005.  (Tr. 125-127.)

From January 1987 to December 1994, Wilson worked in a frozen food factory, where he was responsible for the incoming and outgoing product. As part of the job, he drove a forklift and kept the inventory paperwork. In a typical day, he climbed three hours a day, stood five hours a day, stooped, kneeled, crouched, and handled objects.  From 1994 to 1996, Wilson worked in a factory furniture business.  From January 1996 to February 2000, he installed satellite televisions.  From March 2000 to February 2006, he worked, off and on, as a construction laborer for a home-builder.  From September 2003 until May 2005, he worked as a home healthcare worker.  (Tr. 127, 293-97.)

---

[1]Gout is a disorder characterized by elevated levels of uric acid in the blood, and severe recurrent acute arthritis of sudden onset. Stedman's Medical Dictionary, 665 (25th ed., Williams & Wilkins 1990).

As part of his disability report, Wilson provided a comprehensive list of his medications. He took Aspirin to lower his risk of heart attack, Allopurinol for his arthritis, Amitriptyline for his depression and pain, Atenolol for his high blood pressure, Bacloflen, Cyclobenzaprine, and Norflex to relax his muscles, Condrontantin and Potassium for leg cramps, Hydrochlorothiazide for his gout and to reduce water weight, Humulin for diabetes, Hydrocodone and Vicodin for pain, Pravachol for high cholesterol, Seroquel for sleeping, and Zoloft for depression. A number of these drugs produced side effects, namely, drowsiness, dizziness, dry mouth, vision loss, irritability, and diarrhea. (Tr. 133-34.)

At the end of the disability report, Wilson noted he was "in severe pain on a daily basis [and] I have worked as long as I can possibly tolerate the pain." He did not have any insurance, which made going to the doctor difficult because of the expense. When he could no longer tolerate the pain, he would go to the emergency room, because they would not turn him away. Wilson noted suffering from severe arthritis, severe obesity, gout, back pain, and muscle disease. (Tr. 135-36.)

On January 5, 2004, Wilson saw Kurt G. Zimmer, D.O., for a check-up. A physical examination showed Wilson's vital signs were good, his heart was regular, his lungs were clear, and he had no peripheral edema.[2] Dr. Zimmer noted he had "gained an inordinate amount of weight," and that he now weighed 373 pounds. He advised Wilson to follow-up in a month's time. (Tr. 240.)

On March 31, 2004, Wilson saw Dr. Zimmer for a follow-up, complaining of a sore throat, congestion, coughing, and a fever. Dr. Zimmer found Wilson's lungs were clear, his vital signs were okay, and he had no cervical lymphadenopathy.[3] Dr. Zimmer diagnosed him with hypertension in good control, migraines, morbid obesity, arthralgias, leg

---

[2]Edema is an accumulation of watery fluid in cells, tissues, or cavities. Stedman's Medical Dictionary, 489.

[3]Lymphadenopathy is any disease process affecting the lymph nodes. Stedman's Medical Dictionary, 900.

pain related to Wilson's weight, blindness in his left eye, sinusitis, and upper respiratory infection.[4] (Tr. 237.)

On April 27, 2004, Wilson suffered a tear of his right meniscus. He had been lifting heavy boards and felt a "pop" in his knee. Wilson rated the pain as 9/10, and said it was painful to put weight on his knee. Wilson was given crutches, and discharged in improved condition. An x-ray revealed there was no fracture, dislocation, or other abnormality. (Tr. 279-86.)

On June 14, 2004, Wilson went to the hospital after suffering a mild injury to his right ankle. He was diagnosed with a sprain, and discharged in improved condition. There was no sign of any dislocation. (Tr. 270-77.)

On June 24, 2004, Wilson saw Dr. Zimmer for a follow-up. Wilson was getting married in a week and needed to refill his medicine early. A physical examination showed Wilson's vital signs were good, his heart regular, and his lungs were clear. Dr. Zimmer noted that his weight of 377 pounds was excessive. (Tr. 234.)

On August 18, 2004, Wilson saw Dr. Zimmer. Wilson had been working out in the hot weather, and had recently lost ten pounds. He now weighed 367 pounds. His heart was regular, lungs clear, and affect pleasant. Dr. Zimmer congratulated Wilson on his weight loss, and noted that Wilson would need a Hunting Method Examination physical so he could use a crossbow again. (Tr. 233.)

On January 20, 2005, Dr. Zimmer noted that Wilson had gained thirty pounds since a low of 346 pounds in May 2003. There was no edema or deformity in the joints, and Wilson's blood pressure was at the upper-limit of normal. Dr. Zimmer increased his Vicodin dosage. (Tr. 228.)

On February 3, 2005, Dr. Zimmer wanted Wilson to see a muscle specialist. He noted that Wilson was uninsured and that this presented a problem. (Tr. 226.)

---

[4]Arthralgia is severe joint pain, but not inflammatory. Stedman's Medical Dictionary, 134. Morbid obesity is obesity that is sufficient to prevent normal activity or physiologic function, or to cause the onset of a pathologic condition. Id., 1076.

On February 21, 2005, Wilson saw Dr. Zimmer. He had been laid off from work, and his legs were feeling better after having stopped working. He had been exercising a little at the Community Center, but did not think his leg pain was related to his weight. He weighed 367 pounds at the time of the visit. A physical examination showed Wilson had high blood pressure, but that his lungs were clear, and his heartbeat was regular, though his pulse was slightly tachycardic.[5] Dr. Zimmer told Wilson he believed his leg pain was related to his weight, and encouraged him to continue with his weight-loss efforts. (Tr. 225.)

On April 8, 2005, Wilson went to the emergency room, complaining of blurred vision and feeling "lousy." He was diagnosed with uncontrolled diabetes, hyperglycemia, and hypertension.[6] He was treated and discharged in fair condition. (Tr. 264-67.)

On April 13, 2005, Wilson saw Dr. Zimmer. He had recently gone to the emergency room, and was noted to have a blood sugar level over 400 mg/dl. He was started on insulin and his blood sugar was back in the mid-200 mg/dl range. Dr. Zimmer diagnosed him with hypertension, migraines, blindness in his left eye, morbid obesity, lower extremity osteoarthritis, and Type II diabetes requiring insulin (a new diagnosis). Dr. Zimmer increased Wilson's prescription of Humulin, and instructed him on diabetes care. (Tr. 222.)

On May 19, 2005, Wilson saw Dr. Zimmer for a follow-up. He had "been eating out a lot" but was striving to lower his calorie intake. His legs were still really hurting, but his vital signs were good, he had lost a pound, and his affect was pleasant. (Tr. 219.)

On June 20, 2005, Wilson saw Dr. Zimmer. His blood sugar was in the normal range and he was back working with OSI Construction. He had worked 12 hours the day before. His blood pressure was excellent and he had lost five pounds, to get down to 352 pounds. (Tr. 216.)

On July 20, 2005, Wilson saw Dr. Zimmer. His legs hurt and he had been getting cramps. He weighed 354 pounds. Dr. Zimmer diagnosed him

---

[5]Tachycardia is rapid beating of the heart, usually over 100 beats per minute. Stedman's Medical Dictionary, 1550.

[6]Hyperglycemia is an abnormally high concentration of glucose in the circulating blood. Stedman's Medical Dictionary, 740.

with diabetes requiring insulin, hyperlipidemia, hyperuricemia, chronic leg and lower back pain with exacerbation, migraine headaches, blindness in his left eye, and obesity.[7]  (Tr. 214.)

On August 7, 2005, Wilson went to the emergency room, feeling week. He had been working out in the heat.  An examination showed his chest was clear, his heart rate regular, and his abdomen non-tender.  His respirations were non-labored and even, and he had a strong pulse. Wilson noted no pain.  An x-ray of the chest showed no definite acute infiltrates or effusions, and that the heart appeared to be within normal size limits.  The x-ray indicated bronchitis.  Wilson was discharged in stable condition.  (Tr. 258-61.)

On August 19, 2005, Wilson could not keep his appointment because of work.  (Tr. 213.)

On August 29, 2005, Wilson could not keep his appointment because he could not afford to pay his bill.  (Tr. 213.)

On October 31, 2005, Wilson could not keep his appointment with Dr. Zimmer because "he owes such a large bill."  (Tr. 212.)

On December 4, 2005, Wilson went to the emergency room.  He was diagnosed with chronic back pain and osteoarthritis of the spine.  He indicated the pain was at its worst, 10/10.  He was in mild distress, but he was oriented, his respiratory system was in no acute distress, and he had a regular heart rate.  He was discharged in stable condition with a prescription.  (Tr. 250-51.)

On January 11, 2006, Wilson saw Dr. Zimmer, complaining of severe pain in the legs, hands, and back.  Wilson added that he hurt all over. He was dismayed at having recently gained thirty pounds, and found himself crying.  It hurt just to get out of the car and into the house. He noted that the Flexiril did not help his muscle spasms, and two pain pills were not enough to control his pain.[8]  Dr. Zimmer noted that Wilson

_____

[7]Hyperlipidemia is the presence of an abnormally large amount of lipids in the circulating blood. Stedman's Medical Dictionary, 741, 884. Hyperuricemia is the increased presence of uric acid in the blood. Id., 747.

[8]Flexeril is a muscle relaxant and is used with rest and physical therapy to decrease muscle pain and spasms.                    WebMD,
(continued...)

was tearful and despondent.  He could walk without assistance, but his gait was antalgic and his abdomen was significantly obese.[9]  Dr. Zimmer diagnosed him with diabetes, hypertension, hyperlipidemia, pain in the legs, and adjustment disorder with depression.  (Tr. 210.)

On February 17, 2006, Wilson saw Dr. Zimmer for a follow-up.  He had not picked up his Atenolol from the pharmacy.  Wilson noted having trouble keeping his legs still at night.  His depression was better, but he was out of Zoloft and Seroquel.  Dr. Zimmer indicated he would try and obtain refills from patient assistance.  (Tr. 207.)

On March 1, 2006, Wilson saw Dr. Zimmer.  Wilson had been working doing windows and doors in St. Louis, and had "been absolutely miserable after work.  He cannot get through the day without taking his narcotic pain medicine."  Wilson had not filled the Sinemet prescription for his restless legs because he could not afford it.[10]  A physical examination showed thickening of the skin on both heels, and calluses on each foot. Wilson weighed 382 pounds at the time, up three pounds from two weeks ago.  Dr. Zimmer diagnosed Wilson with diabetes mellitus, and early diabetic peripheral neuropathy in the feet, hypertension, blindness in his left eye from amblyopia, restless leg syndrome, migraine headaches, and morbid obesity.[11]  Wilson told Dr. Zimmer he would be applying for Social Security disability.  Dr. Zimmer thought this was "a reasonable move."  (Tr. 205.)

On March 8, 2006, Social Security Interviewer T. Hood, conducted a face-to-face interview with Wilson. He noted Wilson had trouble breathing

---

[8](...continued)
http://www.webmd.com/drugs (last visited May 14, 2009).

[9]An antalgic gait refers to a posture or gait assumed in order to avoid or lessen pain.  See Stedman's Medical Dictionary, 65, 91.

[10]Sinemet is used to treat conditions associated with Parkinson's disease, such as shakiness or stiffness.                    WebMD, http://www.webmd.com/drugs (last visited May 14, 2009).

[11]Neuropathy is any disorder affecting any segment of the nervous system.  Stedman's Medical Dictionary, 1048.  Amblyopia is decreased visual acuity without any detectable organic disease of the eye.  Id., 53.

and walking because of his weight, but noted no difficulty concentrating, standing, sitting, seeing, or using his hands. (Tr. 121-24.)

On March 19, 2006, Wilson completed a function report.[12] In a typical day, Wilson woke up, ate breakfast, watched television, and took his medications. He has a wife and two daughters, but noted that he was unable to do much for his family, either physically or financially, and that this inability was very depressing and demeaning to his manhood. Before his impairments, Wilson was able to work, enjoy outdoor activities, work in the yard, stand for periods of time, walk, shop, and engage in other basic activities. His current impairments limited his ability to sleep. He had constant pain in his limbs, which caused him to wake at night. He had some problems dressing himself, and shaved only once a week because of problems with his hand. He needed help remembering to take his medication, and did not prepare his own meals because it required too much standing. He did not do house or yard work because of the excruciating pain in his hands, arms, and legs. He left his home to go to the doctor, or to go shopping (about once a month). (Tr. 113-17.)

Wilson used to play golf, fish, and hunt, but was no longer able to do so because these activities required standing and the use of his hands and arms. He had some difficulty getting along with family members. He did not engage in social activities. His impairments affected his ability to lift, squat, bend, stand, walk, sit, kneel, climb stairs, use his hands, and get along with others. Because of the pain and arthritis, these activities were painful. Wilson thought he could walk for 500 or 600 yards before needing rest. He could not sit for long. He was depressed about being in constant pain and unable to provide for his family. (Tr. 117-20.)

On March 30, 2006, Wilson saw Dr. Zimmer, complaining about burning in his hands. A physical examination showed Wilson's blood pressure and weight were up slightly. His affect was good and there was no peripheral edema. Wilson was constantly wringing and rubbing his hands. His liver functions were normal. At the time, Wilson was taking Vicodin, Atenolol,

---

[12]Lisa Wilson, Daniel's wife, completed the form on his behalf. (Tr. 120.)

Hydrochlorothiazide, Allopurinol, Celexa, Decussate, Sinemet, Pravachol, and Seroquel.[13]  Dr. Zimmer diagnosed Wilson with diabetes, blindness in the left eye, restless leg syndrome, and hyperlipidemia.  Dr. Zimmer encouraged Wilson to exercise at least three times a week.  (Tr. 203.)

On June 1, 2006, Holly L. Weems, Psy. D., completed a psychiatric review of Wilson.  Wilson had no severe impairments, but suffered from depression.  He had only mild restriction of his daily living activities, and mild difficulties maintaining social functioning.  Dr. Weems found Wilson had no difficulties maintaining concentration, persistence, or pace, and had no repeated episodes of decompensation.  In her notes, Dr. Weems noted that Wilson was "morbidly obese" and "despondent."  His constant pain and financial situation produced stress.  Dr. Weems found Wilson's functional limitations to be not significant and not severe.  At the same time, Dr. Weems found Wilson credible and his statements consistent.  (Tr. 91-103.)

On June 1, 2006, a medical consultant (the signature is illegible) completed a physical residual functional capacity assessment.  The consultant noted that Wilson suffered from obesity, diabetes, and blindness in his left eye.  The consultant found Wilson could occasionally lift twenty pounds, and frequently lift ten pounds.  He could stand and/or walk for two hours in an eight-hour workday, sit for six hours in an eight-hour workday, and perform unlimited pushing and pulling.  He could occasionally climb stairs, kneel, crouch, and crawl, and could frequently stoop.  He could never climb ladders or scaffolds. He had no manipulative, communicative, or environmental limitations.  The blindness in his left eye limited his depth perception, but the consultant noted no other visual limitations.  (Tr. 104-109.)

On June 8, 2006, Mark D. Zubres, D.O., reviewed an MRI of Wilson's brain.  Wilson had been complaining of severe headaches and neck pain. The MRI was negative and revealed no mass effect, edema, or extra-axial fluid collections.  (Tr. 186.)  An MRI of the cervical spine showed no

_____

[13]Celexa is used to treat depression.  Decussate is used to treat constipation.  WebMD, http://www.webmd.com/drugs (last visited May 14, 2009).

disk bulging or protrusion, and no spinal stenosis.[14]   There was
flattening of the cervical lordosis.[15]   Dr. Zubres found the MRI
unremarkable.  (Tr. 187.)

On June 26, 2006, Wilson completed a disability report appeal.  He
indicated his symptoms had not changed since his last disability report,
and that he had no new injuries or illnesses.  He noted no changes in his
daily activities.  Wilson explained that he was tired and "shaky" all the
time, and it was difficult for him to get up and move around.  His joint
problems and arthritis produced pain, and caused him to move slowly.
(Tr. 80-90.)

On July 19, 2006, Wilson saw Shahid K. Choudhary, M.D., a
neurologist, for a nerve conduction study.  He had been complaining of
numbness, tingling, and pain in his hands that radiated up to his arms
and shoulders.  The pain was constant.  Dr. Choudhary conducted motor and
sensory nerve conduction studies on Wilson's arms and hands.  The studies
of both upper extremities were within normal limits.  The left median
sensory distal latency was mildly prolonged compared to the ulnar nerve.[16]
In sum, Dr. Choudhary found evidence of mild carpal tunnel syndrome on
the left, but the rest of the study was normal.  There was no evidence
of polyneuropathy.  (Tr. 198-200.)

On August 1, 2006, Dr. Choudhary wrote to Dr. Zimmer.  During an
examination Wilson complained of constant pain involving his entire body.
Nerve conduction studies of both upper extremities showed no significant
abnormality, except for mild carpal tunnel syndrome on the left.  Wilson
also complained of fatigue, blurring vision, neck pain, and stiffness.
He noted shortness of breath, back pain, and feelings of depression and
anxiety.  A physical examination showed Wilson's neck was supple with

---

[14]Stenosis is the narrowing or constriction of any canal.  Stedman's
Medical Dictionary, 1473.  Spinal stenosis refers to the narrowing of the
spinal cord.  See id.

[15]Lordosis is an abnormal extension deformity - usually in the form
of a backward curvature of the spine.  Stedman's Medical Dictionary, 894.

[16]Distal latency is the interval between the stimulation of a
compound muscle and the observed response.  See Shin J. Oh, Clinical
Electromyography 15 (3d ed. 2002).

full range of motion. He had no evidence of aphasia or nystagmus.[17] His strength was 5/5 in both upper and lower extremities. His gait was essentially normal. Dr. Choudhary diagnosed Wilson with arm and leg pain, as well as pain throughout hid body. There was "no evidence to suggest peripheral neuropathy," and no evidence of focal neurological deficits. The etiology of the symptoms was therefore unknown. Dr. Choudhary believed fibromyalgia was a possibility.[18] There was no evidence of multiple sclerosis. Dr. Choudhary suggested a rheumatological examination. (Tr. 183-85.)

On August 15, 2006, Wilson went to the emergency room, complaining of chest pain. Tirso Aldana, M.D., noted Wilson had a history of hypertension, obesity, and osteoarthritis of the spine. A physical examination showed Wilson was alert and oriented, with no respiratory or pain distress. His lungs revealed good air entry, and he had no wheezing, rhonchi, or crackles. There was no edema. Dr. Aldana diagnosed Wilson with acute coronary syndrome, hypertension, and obesity. (Tr. 155-56.)

On August 15, 2006, Kenneth McVey, D.O., reviewed an x-ray of Wilson's chest. The x-ray was of poor quality, and Dr. McVey could not rule out the presence of infiltrates, congestion, or small pleural effusions. (Tr. 145.)

On August 16, 2006, Dr. Aldana discharged Wilson from the hospital. Wilson reported doing better. He did not have any chest pains and he was able to tolerate his diet without any problems. A physical exam showed Wilson was alert and oriented. There was no apparent respiratory or pain distress. His heart was normal and there was no edema in the

---

[17]Aphasia is impaired comprehension or communication due to dysfunction of brain centers. Stedman's Medical Dictionary, 104. Nystagmus is rhythmical oscillation of the eye-balls. Id., 1074.

[18]Fibromyalgia is a condition that causes fatigue, muscle pain, and "tender points." Tender points are places on the neck, shoulders, back, hips, arms or legs that hurt when touched. Fibromyalgia is associated with difficulty sleeping, morning stiffness, headaches, and problems with thinking and memory. Medline Plus http://www.nlm.nih.gov/medlineplus/fibromyalgia.html (last visited May 18, 2009).

extremities. On discharge, Dr. Aldana diagnosed him with acute coronary syndrome and hypertension. (Tr. 140.)

On August 17, 2006, Wilson saw Dr. Zimmer, complaining of feeling tired. He reported no headaches, eye symptoms, eyesight problems, congestion, or coughing. At the time, he was taking Lipitor, Celexa, Atenolol, Decussate sodium, Sinemet, Hydrochlorothiazide, Imitrex, Seroquel, Glucophage, Acetaminophen, Gabapentin, Allopurinol, and Humulin.[19] Wilson drank coffee daily, but did not smoke or drink. A physical examination showed Wilson was alert and oriented, and in no acute distress. His eyes were normal. His respiration and heart rate and rhythm were normal, and his lungs were clear. His skin and speech were normal, and he had no edema. He weighed 397 pounds. Dr. Zimmer diagnosed Wilson with high blood pressure, leg pain, chest pain of uncertain etiology, and the presence of several high-risk medications. He also noted Wilson suffered from hyperlipidemia, morbid obesity, diabetic peripheral neuropathy, compression arthralgia of the head/neck, and common migraines. (Tr. 177-79.)

On August 25, 2006, Robert L. Scearce, M.D., reviewed an x-ray of Wilson's heart. The x-ray revealed normal wall motion and a small area of ischemia.[20] (Tr. 189.)

On August 25, 2006, Pervez Ahmed Alvi, M.D., conducted an adenosine stress electrocardiogram. Wilson did not report any chest pain and there were no electrocardiogram changes that suggested ischemia. (Tr. 190.)

On August 28, 2006, Wilson saw Dr. Zimmer. He no longer had chest pains since starting a prescription of Imdur. His headaches were gone since starting a prescription of Clonidine.[21] His hands still hurt. Dr. Zimmer noted that a neurologist had found no evidence of peripheral

---

[19]Lipitor is used to lower cholesterol. Gabapentin is used to help control seizures. Imitrex is used to treat migraines. WebMD, http://www.webmd.com/drugs (last visited May 14, 2009).

[20]Ischemia is local anemia due to mechanical obstruction (mainly arterial narrowing) of the blood supply. Stedman's Medical Dictionary, 803.

[21]Clonidine is used to treat high blood pressure. WebMD, http://www.webmd.com/drugs (last visited May 14, 2009).

neuropathy to explain his leg and hand pains.  Dr. Zimmer's diagnosis remained unchanged.  (Tr. 175-76.)

On September 11, 2006, Alan N. Weiss, M.D., F.A.C.C., wrote to Dr. Zimmer.  Dr. Weiss had performed a heart catheterization.  Despite Wilson's risk factors - diabetes, morbid obesity, hyperlipidemia - the results of the test revealed that Wilson "quite remarkably had no significant coronary artery disease," and also had normal coronary anatomy and normal ventricular function.  Given the favorable results, Dr. Weiss discharged Wilson.  (Tr. 180-82.)

On September 28, 2006, Wilson saw Dr. Zimmer, complaining of abdominal pain.  A recent CT scan of Wilson's abdomen had revealed an abnormal right kidney and a fatty liver.  At the time, Wilson was taking Vicodin, Clonidine, Sinemet, Imitrex, and Humulin.  A physical examination showed Wilson was no longer feeling tired.  He did not have headaches, chest pain, shortness of breath, or a cough.  He had some arthralgia in the legs, abdominal pain in the left flank, and rib pain, but did not have any symptoms of depression or anxiety.  He was alert and oriented, but in acute distress due to the pain in his left side. Abdominal palpation revealed no abnormalities, but his mood was dysthymic, and one of pain and concern.[22]  Dr. Zimmer diagnosed Wilson with hypertension, hyperlipidemia, diabetic peripheral neuropathy, arthralgia of the head, common migraines, and left thoracic and flank pain of uncertain etiology.  Dr. Zimmer prescribed a Lidoderm patch and Seroquel.[23]  (Tr. 172-74.)

On October 30, 2006, Wilson saw Dr. Zimmer for a refill of his prescriptions.  His hands still burned, but his legs were better with medication.  He also complained of feeling tired.  Dr. Zimmer diagnosed Wilson with high blood pressure, hyperlipidemia, diabetic peripheral neuropathy, arthralgia of the head, and common migraines.  A physical examination showed Wilson's musculoskeletal system was "normal despite complaints, hands look normal."  (Tr. 170-72.)

_____

[22]Dysthymia refers to any mood disorder.  Stedman's Medical Dictionary, 480.

[23]Lidoderm is used to relieve nerve pain after shingles.  WebMD, http://www.webmd.com/drugs (last visited May 14, 2009).

On December 7, 2006, Wilson saw Dr. Zimmer, complaining of heavy pain in his legs, hands, and arms. A physical examination showed Wilson had arthralgia in the arms and legs. His lungs and heart were normal, and there were no symptoms of anxiety, depression, or sleep disturbances. His mood was dysthymic, frustrated, irritable, anxious, and one of pain. He was morbidly overweight, at 386 pounds. Dr. Zimmer's diagnosis was unchanged. (Tr. 168-70.)

On January 22, 2007, Wilson saw Dr. Zimmer. He had recently lost his Medicaid. His hands and legs still hurt terribly, and he complained of feeling tired. A physical examination showed his lungs were clear and his respiration normal. His mental status was normal and his mood was euthymic.[24] Dr. Zimmer's diagnosis was unchanged. (Tr. 166-67.)

On February 20, 2007, Dr. McVey reviewed an x-ray of Wilson's thoracic spine, though the x-ray did not provide a clear image. The x-ray revealed mild degenerative arthritis and mild scoliosis. (Tr. 138.) That same day, Wilson was diagnosed with lower back pain, degenerative disk disease, and spondylolisthesis of the spine.[25] (Tr. 139.)

On February 21, 2007, Wilson saw Dr. Zimmer, complaining of severe back pain and high glucose. He had gone to the emergency room, where x-rays revealed spondylolisthesis and degenerative disk disease. He was unable to see a pain specialist having lost his Medicaid. His mood was dysthymic, irritable, concerned, and one of pain. Dr. Zimmer diagnosed Wilson with intervertebral disk degeneration and acquired spondylolisthesis. (Tr. 164-66.)

On February 28, 2007, Wilson saw Dr. Zimmer, complaining of back pain and high blood sugar. At the time, he was taking Imitrex, Sinemet, Lidoderm, Gabapentin, Celexa, Vicodin, Humulin, Allopurinol, Atenolol, Decussate sodium, Hydrochlorothiazide, Clonidine, Glucophage, and Seroquel. A physical examination showed Wilson's back symptoms were severe in the mid-lower back. He had excessive lordosis, and muscle

---

[24]Euthymia refers to a state of joyfulness, mental peace, and tranquility. _Stedman's Medical Dictionary_, 545.

[25]Spondylolisthesis is the forward movement of the body of one of the lower lumbar vertebrae on the vertebra below it, or upon the sacrum. _Stedman's Medical Dictionary_, 1456.

spasms in his mid and lower back.  His mood was dysthymic, concerned, and one of pain.  Dr. Zimmer diagnosed Wilson with high blood pressure, hyperlipidemia, diabetic peripheral neuropathy, intervertebral disk degeneration, and acquired spondylolisthesis.  He recommended continuing Wilson on his current medication.  (Tr. 160-61.)

**Testimony at the Hearing**

On April 9, 2007, Wilson testified before the ALJ.  He last worked in February 2006, when he was building homes with OCI Construction.  As part of the job, Wilson worked as a carpenter, cutting lumber to size. After about three years on the job he was fired for reasons related to his work.  Wilson contributed his poor performance to the problems he had in his hands.  In 2004 and 2005, Wilson cared for his father-in-law through United Health Care.  As part of the job, he ran errands, prepared his meals, and helped bathe him.  Before that, he worked for Levi Incorporated, where he installed television satellites.  He also worked for Rowe Manufacturing where he drove a lift and helped load furniture onto trucks.  Finally, he worked for Specialty Brands for almost five years, where he worked on the food assembly line and as an inventory controller.  (Tr. 287-303.)

Wilson had a driver's license and drove to the hearing.  He typically drove into the town where he lived anywhere from one to three times a day.  When he went to town, he ate lunch, took his wife to work, and picked her up from work.  At the time of the hearing, Wilson weighed 373 pounds.  He was not able to see anyone besides Dr. Zimmer because he did not have insurance to cover other medical visits.  (Tr. 303-04.)

Wilson testified that his diabetes affected his ability to work. In the four or five months before the hearing, his diabetes was out of control.  He also suffered from neuropathy in his hands and legs, joint pain, and back pain.  Wilson's back pain made it difficult to bend over and to lift things.  According to Dr. Zimmer, Wilson's diabetes prevented him from being a good candidate for back surgery.  He had gone to the emergency room recently after he bent over and his back "locked up," to the point where he could not bend back up.  Dr. Zimmer is prescribing as much pain medication as possible for Wilson's back pain.  Because of his

insurance issues, Wilson could not afford to see a specialist. (Tr. 304-06.)

Wilson stated that the neuropathy produced a burning in his hands, accompanied by joint pain, swelling, and constant aching. The symptoms had started in November. Wilson also had similar trouble in his feet. He also believed he had some kind of ongoing muscle disease, though the MRIs were negative. The muscle pain had been present for over six years, and Dr. Zimmer had prescribed Vicodin to help. Because he lacked insurance, Wilson was unable to see a muscle specialist, who could determine if he had multiple sclerosis. (Tr. 306-09.)

Wilson testified that the pain in his hands was almost constant. They were either burning or tingling, or his joints were hurting. His right hand was worse than his left hand. Wilson took Neurontin three times a day, but did not notice much relief. He was unable see a specialist. He used to play golf four or five times a week, but stopped playing in 2005, because of his hands. Wilson went fishing last week, but left after an hour and a half because maneuvering the fishing pole bothered his hands. He cooked in the evenings, but needed help cutting things. (Tr. 309-12.)

To pass the time, Wilson would go to town and eat lunch in a coffee shop. He had a few dogs and spent time with them. He also watched television, but after sitting for an extended period his back began to hurt, and he would have to move around. He read books, and participated in Bible study. Wilson believed he could only sit for an hour or an hour and a half before his back became stiff and he needed to stretch it out. He could only stand for about a half-hour before his back began hurting. This past deer season, Wilson went hunting and never strayed farther than 300 yards from his truck. He avoided lifting things around the house. He could lift a gallon of milk, a case of soda, or a case of water, but avoided picking up anything heavy. Wilson took medication and hot baths to get relief from his pain. Many of these drugs carried certain side-effects, including drowsiness, blurred vision, and stomach pain. Wilson was diabetic and insulin dependent, with his blood sugar level usually between 200 and 300. (Tr. 312-18.)

During the hearing, Susan Shea testified as a vocational expert (VE). The VE noted that Wilson had worked jobs characterized as skilled light work, semi-skilled medium work, unskilled medium work, and semi-skilled heavy work. The ALJ had the VE assume that Wilson could lift and carry twenty pounds occasionally, ten pounds frequently, could stand and/or walk for two hours in an eight-hour day, and sit for six hours in an eight-hour day. The ALJ also had the VE assume that Wilson was blind in his left eye, could not climb ladders or scaffolds, and could occasionally climb stairs, kneel, crouch or stoop. Under these circumstances, the VE testified that Wilson could not perform his past relevant work. However, the VE testified that Wilson could perform the production jobs of manual assembler or machine tender. If the VE assumed that Wilson had no more than occasional gross manipulation or grasping, then Wilson would be unable to perform the productions jobs, or any other work in the national economy. The VE testified that her conclusions were consistent with the <u>Dictionary of Occupational Titles</u>. (Tr. 318-22.)

### III. OPINION OF THE ALJ

The ALJ found that Wilson had not engaged in substantial activity since February 13, 2006 - the amended alleged onset date. The ALJ also determined that Wilson suffered from morbid obesity, diabetes, mild carpal tunnel syndrome, mild degenerative disease or scoliosis of the spine, and blindness in his left eye. The combination of these impairments was severe, but not disabling. (Tr. 11, 17.)

The ALJ found Wilson's obesity did not, by itself or in combination, meet any of the medical listing sections. The ALJ found Wilson's back impairments did not meet any listing requirements. Wilson did not have any evidence of nerve root compression or sensory or reflex loss. Finally, the ALJ found Wilson's diabetes did not meet any listing requirement. He did not have neuropathy demonstrated by significant and persistent disorganization of motor function in two extremities. (Tr. 11-13.)

The ALJ considered Wilson's testimony from the hearing. If all of the claimant's allegations were credible, the ALJ acknowledged that Wilson would be unable to work. The ALJ also noted that Wilson suffered

from medically determinable impairments, had taken many medications, including narcotics, and received regular treatment. However, Dr. Choudhary, a neurologist, had found no evidence of polyneuropathy or peripheral neuropathy in his tests. Dr. Zimmer also repeatedly found that Wilson's motor examinations were unremarkable. A mild carpal tunnel syndrome does not preclude working. The ALJ believed Wilson's diabetes was controllable with insulin. Despite some elevated readings, other readings showed Wilson had good control of his insulin. There was also an instance where Wilson had not taken his prescribed insulin. Despite complaints of musculoskeletal symptoms, x-rays and MRIs repeatedly came back negative. There were no signs of swollen or deformed joints, limitation of motion, or edema. There were no findings of motor, sensory, or reflex abnormalities. Dr. Zimmer found Wilson's hands and musculoskeletal system normal. Dr. Zimmer also believed Wilson's leg symptoms could be related to his weight, with the evidence showing he was capable of losing weight. (Tr. 13-15.)

Wilson suffered from hypertension and hyperlipidemia, but testing showed no coronary artery disease. There was also no evidence these conditions precluded work. Wilson had also worked despite being blind in one eye. At times, Wilson was dysthymic. But other times, he was euthymic, and there was no testimony at the hearing relating to mental symptoms that would preclude work. Dr. Weems, a psychologist, found Wilson did not have a severe mental impairment. (Tr. 15.)

Looking to the record, there were no reports from any medical source that Wilson could not work, or that he was disabled. The ALJ also found no medical evidence documenting that Wilson could not perform work that involved light lifting and mostly sitting. At the one-hour hearing, Wilson sat without any sign of discomfort. At its conclusion, he stood and moved without difficulty. (Tr. 15-16.)

The ALJ found Wilson's appearance, demeanor, and activities of daily living, when viewed with the evidence as a whole, detracted from his allegations of disabling symptoms and limitations. The ALJ believed Wilson's symptoms limited his ability to do his past work, but did not prevent him from doing all types of work. In particular, the ALJ found Wilson retained the residual functional capacity (RFC) to lift and carry

twenty pounds occasionally and ten pounds frequently, stand and walk for two hours in an eight-hour workday, and sit for six hours in an eight-hour workday. The ALJ also found Wilson had the RFC to occasionally kneel, crawl, crouch, and climb stairs, but never climb ladders. Based on the VE's testimony, the ALJ found Wilson was capable of performing work as a manual assembler or a machine tender. As a result, Wilson was not disabled within the meaning of the Social Security Act. (Tr. 16-18.)

## IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and is supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, No. 07-3561, 2009 WL 1212805, at *6 (8th Cir. May 6, 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 2009 WL 1212805, at *6. A five-step regulatory framework is used to determine whether an individual qualifies for disability. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 2009 WL 1212805, at *6 (same).

Steps one through three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from

a severe impairment, and (3) his disability meets or equals a listed impairment.  <u>Pate-Fires</u>, 2009 WL 1212805, at *6.  If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five.  <u>Id.</u>  Step four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant work.  <u>Id.</u>  The claimant bears the burden of demonstrating he is no longer able to return to his past relevant work.  <u>Id.</u>  If the Commissioner determines the claimant cannot return to past relevant work, the burden shifts to the Commissioner at step five to show the claimant retains the RFC to perform other work.  <u>Id.</u>

In this case, the Commissioner determined that Wilson could not perform his past work, but that he maintained the RFC to perform other work in the national economy.

## V.  DISCUSSION

Wilson argues the ALJ's decision is not supported by substantial evidence.  First, Wilson argues that the ALJ's RFC determination is not supported by substantial evidence.  In particular, he argues the ALJ failed to consider the effects of his pain and obesity on his ability to work.  He also argues the ALJ erred in finding him not completely credible.  Second, Wilson argues the VE's testimony in the first hypothetical failed to include all relevant impairments.  In particular, he argues the hypothetical failed to include any limitations based on his daily pain.  (Doc. 17.)

### Residual Functional Capacity

Wilson argues that substantial evidence does not support the ALJ's RFC determination.

The RFC is a function-by-function assessment of an individual's ability to do work-related activities based on all the evidence.  <u>Casey v. Astrue</u>, 503 F.3d 687, 696 (8th Cir. 2007).  The ALJ retains the responsibility of determining a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians, examining physicians, and others, as well as the claimant's own descriptions of his limitations.  <u>Pearsall v. Massanari</u>, 274 F.3d 1211,

1217-18 (8th Cir. 2001).  Before determining a claimant's RFC, the ALJ
must evaluate the claimant's credibility.  Id.  Ultimately, the RFC is
a medical question, which must be supported by medical evidence contained
in the record.  Casey, 503 F.3d at 697; Lauer v. Apfel, 245 F.3d 700, 704
(8th Cir. 2001).

In this case, the ALJ found Wilson's allegations not credible, and
concluded Wilson retained the physical ability to perform work in the
national economy.  In particular, the ALJ concluded Wilson retained the
RFC to lift and carry twenty pounds occasionally and ten pounds
frequently, stand and walk for two hours in an eight-hour workday, and
sit for six hours in an eight-hour workday.  The ALJ also found Wilson
had the RFC to occasionally kneel, crawl, crouch, and climb stairs, but
never climb ladders.  Substantial medical evidence supports these
findings.

From March 2000 to February 2006, Wilson worked, off and on, as a
construction laborer.  From September 2003 to May 2005, he also worked
as a home healthcare worker.  During these periods of employment, Wilson
was able to work despite weighing over 350 pounds.  Indeed, in January
2004, Wilson weighed 373 pounds, but his vital signs were good and he had
no edema or deformity in the joints.  In August 2004, Wilson weighed 367
pounds, but was interested in using a cross bow to go hunting.

In June 2005, Wilson weighed 352 pounds, but was working the
construction job.  In August 2005, an x-ray showed Wilson's chest was
clear and his heart was within normal size limits.  Despite going to the
emergency room, Wilson noted no pain.

In January 2006, Wilson was despondent about his weight.  He could
walk without assistance, but his gait was antalgic.  In March 2006, Dr.
Zimmer believed applying for disability was "a reasonable move."  In June
2006, Dr. Weems found Wilson did not have any severe mental impairments,
but found his statements relating to pain and stress credible.  That same
month, an MRI of Wilson's spine showed no stenosis or encroachment.  In
July 2006, Dr. Choudhary conducted nerve conduction studies and found the
results within normal limits.  There was no evidence of polyneuropathy.
In August 2006, Wilson no longer had chest pains.  In September 2006,
testing showed no significant coronary artery disease.  In October 2006,

Dr. Zimmer found his hands looked normal.  In December 2006, Wilson had no signs of depression or sleep disturbances.

In February 2007, an x-ray revealed mild scoliosis and mild arthritis.  Dr. McVey noted disk degeneration, lordosis, and back spasms. In April 2007, Wilson testified that he drove to the hearing, and drove a few times each day.

In his disability application, Wilson complained of high blood pressure, diabetes, excessive obesity, arthritis, joint and muscle fatigue, severe back problems, ankle swelling, blindness in his left eye, and gout.  Yet, Wilson worked despite his obesity and despite his blindness.  An MRI of his spine showed no bulging or protruding disks, and no stenosis.  Nerve conduction studies were within normal limits, and there were no signs of neuropathy.  See Stephens v. Shalala, 50 F.3d 538, 541 (8th Cir. 1995) (noting that the lack of objective findings to support pain is strong evidence of the absence of a severe impairment). Dr. Zimmer found no joint deformity and no problems with his hands. Wilson's legs were better with medication.  His lungs and heart were consistently normal.  More to the point, Dr. Zimmer never restricted Wilson's ability to work, and continually pursued a conservative line of treatment.  See Craig v. Chater, 943 F.Supp. 1184, 1189 (W.D. Mo. 1996) ("Allegations of a disabling impairment may be properly discounted because of inconsistencies such as minimal or conservative medical treatment.").  Looking to the record, substantial medical evidence supports the ALJ's RFC determination.


**Subjective Complaints of Pain**

Wilson argues the ALJ failed to properly consider his subjective complaints of pain.  He also argues that the ALJ erred by finding him not completely credible.

The ALJ must consider a claimant's subjective complaints.  Casey, 503 F.3d at 695 (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)).  In evaluating subjective complaints, the ALJ must consider the objective medical evidence, as well as the so-called Polaski factors. Guilliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005).  These factors include: 1) the claimant's prior work history; 2) the claimant's daily

activities; 3) the duration, frequency, and intensity of the claimant's pain; 4) precipitating and aggravating factors; 5) dosage, effectiveness, and side effects of medication; and 6) functional restrictions. Id.; O'Donnell v. Barnhart, 318 F.3d 811, 816 (8th Cir. 2003). While these factors must be taken into account, the ALJ does not need to recite and discuss each of the Polaski factors in making a credibility determination. Casey, 503 F.3d at 695.

The ALJ may discount subjective complaints of pain when the complaints are inconsistent with the evidence as a whole. Id. However, the ALJ may not discount a claimant's allegations of disabling pain simply because the objective medical evidence does not fully support those claims. O'Donnell, 318 F.3d at 816. When rejecting a claimant's complaints of pain, the ALJ must "detail the reasons for discrediting the testimony and set forth the inconsistencies found." Guilliams, 393 F.3d at 802. If the ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, the reviewing court "will normally defer to the ALJ's credibility determination." Casey, 503 F.3d at 696.

The ALJ set out the Polaski factors in his decision, and addressed several of the factors in discounting Wilson's subjective complaints. The ALJ noted that Wilson had earned a good income and took several drugs on a regular basis, including narcotics. The ALJ also detailed Wilson's daily living activities, his functional restrictions, and his complaints of constant pain. Indeed, the ALJ noted that if all of Wilson's allegations were "fully credible, he would not be able to work." (Tr. 13.) However, the ALJ found that Wilson's complaints about uncontrolled diabetes and neuropathy were contradicted by the record. See Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006) ("Subjective complaints may be discounted if the evidence as a whole is inconsistent with the claimant's testimony."). The ALJ also noted Wilson testified that he went hunting, went fishing, cooked, drove into town on a daily basis, and had lunch with friends. See Johnson v. Apfel, 240 F.3d 1145, 1149 (8th Cir. 2001) ("The fact that [the claimant] was able to carry on a normal life contributes to the finding that his impediments were not disabling."). In addition, the ALJ remarked that Wilson had sat through the one-hour hearing without any sign of discomfort, and stood and moved

without difficulty at its conclusion.  See id. (noting the ALJ may rely on personal observations in making credibility determinations).  Under the circumstances, the ALJ followed the Polaski factors, and properly considered Wilson's subjective complaints of pain.  The ALJ also gave sufficient reasons for his credibility determination.

**Obesity**

Wilson argues the ALJ failed to consider the effects of his obesity on his ability to work.

Obesity is not, on its own, a listed impairment.  Brown v. Astrue, No. 4:08 CV 483 CAS FRB, 2009 WL 88049, at *11 (E.D. Mo. Jan. 12, 2009). Nevertheless, the Social Security Regulations require the Commissioner to consider the cumulative effects of a claimant's allegations of obesity when determining whether the claimant is disabled.  Id.; Grimm v. Astrue, No. 5:07 CV 5196, 2008 WL 4756395, at *4 (W.D. Ark. Oct. 29, 2008). Indeed, the regulations state that obesity is a medically determinable impairment, often associated with disturbance of the musculoskeletal system.  20 C.F.R. 404, Subpt. P, App. 1, § 1.00 (Q).  Disturbance of the musculoskeletal system, in turn, "can be a major cause of disability in individuals with obesity."  Id.  The combined effects of obesity and musculoskeletal impairments can be worse than the effects of each impairment considered separately.  Id.  As a result, adjudicators must consider any additional and cumulative effects of a claimant's obesity under the listings and when assessing the individual's residual functional capacity.  Id.

In this case, the ALJ cited Social Security Ruling 02-01p and noted he carefully considered whether Wilson's obesity, either by itself or in combination with other impairments, equaled any listing section.  The ALJ concluded it did not.  Later in the opinion, when determining the RFC, the ALJ noted that Wilson's morbid obesity would make it too difficult for him to engage in prolonged standing, certain climbing activities, and heavy lifting.  Under the circumstances, the ALJ properly considered the effects of Wilson's obesity.  See Armoster v. Astrue, No. 5:08 CV 58 BSM, 2008 WL 5424137, at *4 (E.D. Ark. Dec. 30, 2008) (noting there is no

bright line between sufficiently and insufficiently discussing a
claimant's obesity).

**Hypothetical Question**

Wilson argues the VE's testimony in the first hypothetical failed
to include all relevant impairments.

The Commissioner can rely on the testimony of a VE to satisfy his
burden of showing that the claimant can perform other work. <u>Robson v.
Astrue</u>, 526 F.3d 389, 392 (8th Cir. 2008). For the VE's testimony to
rise to substantial evidence, the ALJ's hypothetical question must be
correctly phrased and must capture the concrete consequences of the
claimant's deficiencies. <u>Id.</u> The ALJ's hypothetical question does not
have to include all of the claimant's alleged impairments; it need
include "only those impairments that the ALJ finds are substantially
supported by the record as a whole." <u>Lacroix v. Barnhart</u>, 465 F.3d 881,
889 (8th Cir. 2006).

During the hearing, the ALJ's hypothetical question had the VE
assume that Wilson could lift and carry twenty pounds occasionally, ten
pounds frequently, could stand and/or walk for two hours in an eight-hour
day, and sit for six hours in an eight-hour day. The ALJ also had the
VE assume that Wilson was blind in his left eye, could not climb ladders
or scaffolds, and could occasionally climb stairs, kneel, crouch or
stoop. This hypothetical corresponded to the ALJ's ultimate RFC
determination. Looking to <u>Lacroix</u> and <u>Robson</u>, the hypothetical question
to the VE was correctly phrased and captured the consequences of
Hartley's impairments.

## VI. RECOMMENDATION

For the reasons set forth above, it is the recommendation of the
undersigned that the decision of the Commissioner of Social Security be
affirmed under Sentence 4 of 42 U.S.C. § 405(g). The parties are advised
that they have ten days to file written objections to this Report and
Recommendation. The failure to file timely written objections may waive
the right to appeal issues of fact.

     /S/  David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on June 1, 2009.